Thank you, Your Honor. May it please the Court. My name is Craig Hensel. I'm here on behalf of Appellant Daniel Bittle-Lindsey. We are here today to ask the Court to recognize, what the defendants themselves have already recognized, that Seegars is a single company- I think it's okay for you to remove that mask from that distance, unless you are uncomfortable doing so. That's reasonable to me, Your Honor. I'm asking the Court to recognize that Seegars is a single company with multiple alter egos. Seegars itself recognizes this. It admits it in its marketing materials, on its website, its employee handbook, and even in its own internal discussions. Counsel, I'm sorry to interrupt, but just so I understand where we're going. This is your only claim. You are not arguing that Seegars Newport alone has more than 15 employees? Your Honor, we do believe that is a facted issue, but we don't believe it's our strongest claim. We will be going forward on the Pierce the Veil theory of liability here today. That's the only claim you want us to consider? Yes, Your Honor. Okay. The only time that Seegars denies that it's a single company, in fact, is actually now. When doing so, it might render it liable. We're here on appeal of a granted motion for summary judgment. Standard review is de novo, and briefly give the background. Mr. Bittle-Lindsay was an employee for Seegars Fence Company. I think we can go directly to the issue that you're bringing us. You say that you don't rely on Newport as having 15 employees, so the basis that you argue is that we ought to pierce this corporate veil and that use all these employees, a part of them, to exceed the 15 so you can be able to proceed. Yes, Your Honor. We kind of have the facts now. Okay, so for smaller employers, employers with less than 15 employees, there have been multiple ways recognized of those under laws with a 15-employee threshold. The PAPA, the Katie Industry case, lays out several of those and they're also recognized in... Can I ask you, this sort of goes to my first question, I really am trying to get my hands around what it is you are arguing. The PAPA case does talk about different ways you might get over 15, but only one of them is piercing the corporate veil, and I thought that was the only one you want us to consider, right? In brief, Your Honor, we do talk about the excessive fragmentation issue as well. And did you raise that as a separate claim before the district court, or did you just tell the district court, pierce the corporate veil? We have not precluded ourselves from that argument, Your Honor. It's not a specific cause of action, but that is... This is a de novo hearing. You say you have them, but you need to be more I thought the issue here is on piercing the corporate veil. I didn't know we were considering other instances in which less than 15 would be there, because it didn't seem as though that's properly raised. I mean, this is a... The hearing here is de novo, Your Honor. We haven't... It comes... It is de novo, but I think there is just some confusion here. The court in PAPA is talking about two different things. One is, maybe you can pierce the corporate veil. The other is, you absolutely cannot pierce the corporate veil, but under whatever it's called... In terms of... To define employer for some of these civil rights statutes, even when you can't pierce the corporate veil, that's off the table. There are circumstances under which we will allow for aggregation of the number of employees across entirely separate corporations. But I didn't understand that you raised that separate theory before the district court. I thought you only asked the district court to pierce the corporate veil. We did not, Your Honor. You also said, even if you don't pierce the corporate veil, we nevertheless should win on this separate theory. We did, Your Honor. And issue preclusion has never been argued on that part by defense counsel. It's not really issue preclusion. It's more just that you can't come to us with a theory that you as an argument against whether Sears Newport has 15 employees or argument on that factual issue. They haven't raised it as an argument that we didn't raise the excessive fragmentation issue in front of the district court. That was an argument brought before the district court. I thought before the district court you argued excessive fragmentation might be a reason to pierce the corporate veil. It's both an element and on its own. We argue that it's both an element and on its own a separate cause. Can you address the Johnson decision from our court where we talk about when you can aggregate employees in a parent subsidiary relationship? And we say that you cannot do it merely because they're the parent. And then it goes on to say a parent company is the employer of a subsidiary's personnel only if it controls the employment decision, so it's the decision maker, or you can pierce the veil is the second. So it gives those two options. It doesn't include this third possibility, this excessive fragmentation possibility. Why isn't that only in that phrase suggestive that that resolves our question? We don't have an excessive fragmentation theory in the Fourth Circuit. I don't know if that case, Your Honor, was relying on its understanding of precedent or whether that was actually on its own saying that those are the only two reasons. Going off of precedent, there is... No, I mean, that's the ADEA case, right? So it's a different statute, but the same question, right, is about how many employees it's got, and that's what I take. Maybe you tell me that's not the holding, but I take it to be that the parent is only if it controls. Now, maybe if it's not a parent, maybe you want to say this isn't a parent subsidiary, but I take it otherwise you're arguing that it is. This is absolutely not a parent subsidiary relationship, Your Honor. The defendants will be the first to admit, perhaps even argue, that these companies are not parent subsidiary. They're not franchisor relationships. They don't have any kind of contractual relationship in that Our argument is that that lack of contractual relationship is part of the piercing the veil issue to begin with because the contractual relationship allows them to deal with each other at arm's length, but when it comes to the excessive fragmentation issue... But if they have no contractual relationship, how do we even get to the... I think they do contractual relationship, but how do we then get to piercing the veil? I mean, we think about piercing the veil in the context when there's like they are interrelated. And they're significantly interrelated here, Your Honor. It's the contractual relationship between a well-organized subsidiary parent relationship or a franchisor franchisee relationship that has both companies working in their own independent interests. That has them dealing with each other at arm's length. Here, they don't have such a contract that defines their duties and obligations and rights with regard to the relationship between each other. They're not going to be dealing with each other at arm's length, but they're inexorably interconnected. They have shared ownership. The Seegers, the Seegers, Batchelor and Rouse families, primarily the Seegers family... Some of the shareholders overlap is what you mean by shared ownership. Not just some of the shareholders, Your Honor. The majority shareholders or at least 50% shareholders in every single Seegers entity are a member of the Seegers or the Batchelor family or combination thereof. It is significant overlap in ownership. The three executives of Seegers corporate, whose names escape me right now, but three executives of Seegers corporate stand as president or vice president of every single Seegers entity. And I should say that I'm not just making up that phrase Seegers corporate to make it sound like a company. That's a phrase they use as our branches, which is what they refer to every other Seegers entity as. They call themselves corporate. They call themselves branch entities. They are themselves recognized as a single company, Your Honor. If I could get back to the excessive fragmentation issue that was raised earlier, the parent-subsidiary relationship is not particularly subject to excessive fragmentation because excessive fragmentation is a single enterprise that is split into multiple corporations. A parent-subsidiary relationship is kind of by default split and by necessity, given that organization, multiple corporations. It wouldn't really be an excessive fragmentation. Excessive fragmentation wouldn't really be a concern in the parent-subsidiary relationship. Doesn't it, at least under the Papa case, it's not just excessive fragmentation at a broad level. It's excessive fragmentation, quote, for the express purpose of avoiding liability under the avoiding discrimination laws that we might combine them as an employer. But what is the evidence here that the purpose of any fragmentation that's here had anything to do with the ADA? We're never going to, in fact, cases are almost never going to get direct evidence of that, Your Honor. The purpose is going to be kind of inferred through indirect evidence. Right, but I think what cases like Papa have in mind is like you have 140 person corporation and you decide, you know what, I'm just going to break myself into 10 corporations of 14 each. Then you might infer from that, oh, you're probably trying to avoid the 15 person minimum under the civil rights statutes. Where's that evidence? Well, what we have here is a 276 person corporation who opens a new corporation each time they open a new office. The offices themselves are kept small. The Newport office, for example, has 13 employees just under the statutory minimum. What about the others? Is that in the record anyway? That is not in the record except for the fact that Sears corporate is slightly over that limit. And they're all, I mean, they're in different geographic areas, right? They are. I mean, so there is an obvious reason why they have a different corporate form in each area because they're not the same ownership right? There's overlapping ownership but they're not the same ownership and they're in different geographic areas. So it would be odd not to be separate entities here, wouldn't it? It would not be odd not to be separate entities. Pretty much any company that is national, multinational, even state level has multiple locations, multiple areas in which they operate and yet is. But the same ownership, right? In that scenario, that posits a situation where there's the same ownership. Here, they don't have the same ownership. That's true, your honor. And at the same time, if one were to, they may have broader ownership. One would have the same effective result by having a single corporation with the same owners as you see in the split entities just kind of merged together with equivalent stakes in the overall corporation. They have opened, again, a new corporation every single time they open a new location. That said, with or without the excessive fragmentation issue, we still argue that we were able to pierce the corporate veil, which is a valid test here. I believe defense argument for the entire brief was focused on the integrated employer test, which is a separate test from the corporate veil. If we include excessive fragmentation as an element, we meet nine of the 13 elements. If we don't, we meet eight of the 12 elements. The elements we meet... What is the best support in the, I mean, piercing the corporate veil is sort of an established doctrine, right? And we see that in lots of different areas. Is there any other context in which we have as an element excessive fragmentation in the piercing the veil context? Not that I'm aware of, Your Honor. That said, these are companies, as I said, that fail to deal with each other at arm's length. They seem to see themselves as a single entity. They put themselves forward as such intentionally to mislead consumers and prospective employees. Your Honor, we're simply asking the court... Why would they do that? I mean, why would you want to mislead consumers? I thought the purpose was you set up these different entities. You put someone like Mr. Rueck, who's a manager of 50% interest, incentivizes him. I thought it was, well, in Goldsboro, North Carolina, I was impressed. You got all these different ownership, not primarily by the seeker people. And I think the central issue has to do with the labor control issue here. And as I understand, Mr. Rueck is the one who actually does all of that labor relations within it. And so the reason, I don't know if you indicate, is to deceive customers or consumers, but I don't understand the purpose of doing so when it seems clear that there is a to really take ownership of the company and sell some fences. I understand, Your Honor. Thank you. So, the Seegers itself, in its 30B6 deposition, admitted that the reason it had its companies on its website, it aggregated its number of employees, that it aggregated its company, that every indication on its website seems to show that all of these Seegers entities are a single company. Seegers itself admitted that that was to instill consumer confidence in a brand that has been around since 1949, which that 1949 year only applies to Seegers corporate. It does not apply to the branch entities. If they are indeed separate companies, that is not a brand that has been around since 1949. The aggregation, the appearance of these being a single company that is intentionally put forward by Seegers is specifically on the consumer side to instill consumer confidence in the overall brand. All right, Mr. Henson, let's hear from your opposing counsel, and then you have the fortune of having additional time to rebut. Thank you, Mr. Henson. May it please the court, my name is Katie Hartzog, and I represent the defendants in this matter, Seegers Corporation and Seegers of Newport. I'd like to first just start off by clearing up some of the questions that you've already asked and the issues that have already been raised. So, how these corporations work together, they are indeed completely separate corporations, is Seegers Corporate, which is in Goldsboro, North Carolina, serves the administrative... That one and the other one, and I take it there's no conflict in doing so, because if, I guess the outcome would be if the plaintiff prevailed, I guess Newport would be on the hook, or I don't quite understand what the outcome would be. But I'm just as curious as you say they're separate, but they have one counsel. They are separate, and I am representing both of them because they do not have a conflict of interest between the two of them, because everyone is in agreement about how these businesses work together. I'm not saying they should, I'm just, I just thought I'd, you know, I was interested in usually when you have separate entities and one is saying, well, and maybe the interests aren't disagreeing in terms of what they are seeing the situation, but the other side is saying they are one thing and you say you're not, but the two of you agree, at least the two corporations agree of what they are. So, you can proceed. I just threw you off a little bit there. Well, I might get into that right now, because what Seegers Corporation does is handle a lot of the administrative functions for the branches. So, they handle the website, they handle insurance negotiations, they would hire an attorney if one needed to be hired to give advice to someone. I mean, they do all of those administrative things for the branches. What the branches do is set fences and install fences. And so, the whole business model here is that to allow the branches to focus on what the branches do best, which is sell fences and install fences, they want to take these administrative functions off the branches and allow them to focus on what they really do. Meanwhile, Seegers Corporate... Am I fair in sort of thinking about this as like a, it's a homegrown franchise, right? I mean, you're not using franchise law, but you've just created sort of a franchise situation where you've got a corporate and corporate's got some ownership interest in each of its branches. But as Judge Wynn pointed out, each of the branches is really owned by somebody who's got the incentive to, you know, sell as many fences as they can sell. But, and you haven't used a technical franchise law, but this is sort of a homegrown version of one drawn up on a napkin. It is. And there's no doubt that there's interrelationship between these companies that they support one another, but they are totally separate distinct companies. Each one is incorporated separately. Is that right? I'm sorry. Each one of those branches that you call them incorporated. They're all incorporated separately. And the business model behind that is that they have different business partners who are in those locations or in those markets dealing with the customers in that area. And just like you said, they want to give these people in this market the incentive to do well. And so if they do well, they make money. If they don't do well, they lose money. They want them to have skin in the game. And that's the whole business model here. And that's why they are incorporated separately to allow that to happen. If it were one big, huge company, then, for example, Newport might have expenses for a lawyer right now. Well, that expense would be borne out by every other branch in the organization. The way it's set up is Newport bears that expense alone. Meanwhile, if another branch does really well one year and sells $3 million worth of fences, then they keep a profit from that. So it really incentivizes these different branches to do well and to succeed. So is this corporate structure here something? I'm wrecking my brain trying to think if I've seen something looks like this. That's not a franchise. It's not a franchise per se because you didn't follow the law. It's not just totally separate because there is some interconnectivity there somewhere. It's an interesting structure. Actually, I was curious about it when I saw it. I don't know if your law firm actually set it up. My law firm did not set it up, but a lawyer did help with it. It was not us. There are certainly members of the Seegers corporate part of this that have ownership stakes in the branches. They invest in these companies, and that is exactly why this corporate structure is set up like this so that they can avoid liability if, for example, one branch fails. That's the whole reason they're set up separately. Can I ask you a question? A big part of your colleague's presentation is about how Seegers holds itself out to the public for marketing purposes as one entity. How does that factor into the bail piercing analysis in your view? I actually disagree with that because what he's talking about is the website and everything that's on the website. If you were to log on to that website from a certain location, based on where you log on, where you are physically, it would take you to the landing page for the branch that's in your area or closest to your area. The website actually lays out each of the individual branches have a separate page. On that page, it tells who owner and manager of that branch is. I'll just make the question purely hypothetical. What role does public-facing marketing play in the piercing the corporate bail analysis? I don't think it plays any part of it at all because we cited to a couple cases in our brief where courts have looked at this, and I couldn't find any in the Fourth Circuit. These are actually California cases, federal court cases out in California where this issue was addressed, and they said that a website is just an administrative function of a business, and it's not unusual in this business climate that we're all in these days for businesses to share that expense. One of the courts looked at it and said, as long as it's clear that different locations are owned by different entities, and here it is because our website specifically lays out that different branches. I'm thinking of a tree that's tied in with branches out. There's something center on it, and it's this corporation. I'm wondering why don't you say affiliates are something that is not so connected to it because a branch is intimately connected with that trunk there, and if it's not connected, it dies. I don't mean for it to be a term of art in any sense. I use the term branch because that's what's in the record. That's what the Seegers representative called it. He also calls these people who own these different entities. He calls them business partners because, in essence, they are in business together. They have entered into these relationships. I don't think he controls it. I'm just saying figuratively that's in my head when you use that term. You may continue, but I just wanted to add that. I understand. The reason why I use it is because that's what's in the record, and I feel like that's what I have to call it since that's how it's described in the record or how it's portrayed in the record. Of those things, those elements that form that integrated employer test, do you agree that it's the centralized control of the labor relations that's probably the one that you would weigh the heaviest? Absolutely, and that's what the case law says is that that is the most important thing to look at is who controls the employment relationship. In this case, it is clear. Clint Rouse testified that he hires and fires all employees. The testimony from the Seegers corporate representative was that they have nothing to do with hiring and firing. They don't even know when employees are being hired and fired. They don't know that they're even looking to hire or fire anyone. They have nothing to do with payroll. They have nothing to do with the day-to-day management of the company. They have nothing to do with disciplinary decisions. I mean, there's just absolutely no control by Seegers Corporation over what happens day-to-day at the branches. So if we're looking at the integrated employer doctrine, it just does not apply here. You only can look at Newport because Newport was the largest company in the country at any time. And on the fragmentation theory of the integrated employer inquiry, is it your position that just that's wrong or is your position that right or wrong it just doesn't apply here? Right or wrong, it does not apply here because there's not excessive fragmentation because these companies are set up completely separate and it's because of the different markets and because of the different locations. That's the only reason why they're set up differently or they're set up separately. It's not done intentionally to harm anyone. It's not done intentionally to take away anyone's rights or to avoid compliance with any law that might otherwise apply. It's only done because of the market. It's like a gerrymander theory. That's the way I read, Papa, that it's you're looking for sort of a splitting up into small things that wouldn't make any sense otherwise. That's not how you would draw the lines otherwise, but here it makes sense to have the separate branch. Separate affiliates, branches, whatever you want to call them. Absolutely. Remind me of this, please help me out. You have about 14 of these so-called branches? That sounds right. And do any of them have employees over 15? It's not in the record, Your Honor, but they do. Yes. I mean, it makes sense. I mean, think about it. Newport, I'll look this up. Newport has a population of less than 4,500 people. Where's Newport? Newport is near the coast. Oh, okay. And so, you know, they have branches in Greensboro and Raleigh and Charlotte and Greenville, North Carolina. These places have a much larger population. They're going to build a lot more fences. They're going to need more employees. So the only reason why Newport doesn't have 15 employees is because the market is a lot smaller, there's a lot less fences to build, and they don't need that many employees. You know, this is a bad set of facts. At least when I look at it, at least it raises some questions. I'm not saying it goes one way or the other. If you really got beyond this question as to what really happened here. But it seems to me to avoid at least coming under the ADA, you just don't have 15 employees in one of these entities here. Whereas you're telling me the others do. So this issue wouldn't be with regard to the others there. If Mr. Biddle, Lindsey worked for another organization, another branch somewhere else in a bigger market, we would probably be talking about the substance of the case. So is there no redress to someone who's being put in the situation of Mr. Biddle here? Well, beyond, I suppose beyond the ADA is what I'm saying. I suppose he could have other claims, but they weren't brought here. And you know, Congress made the decision for all of us. I don't know, I'll withdraw that. Go ahead. I just wonder if there's state law claims. I don't know whether the state of North Carolina have discrimination claims. Well, the state of North Carolina has a wrongful discharge in violation of public policy claim that can apply under certain circumstances. I don't know that it applies here, but there is a potential claim that could apply. But to answer your question, Judge Wynn, Congress set this up so that small employers who have less than 15 employees can focus on running their business and don't go under because of having to comply with federal regulations that might be very burdensome for them under certain circumstances. They probably didn't have this scenario in mind, though. I'm not sure that it'd be this kind of connectivity with a major corporation. And then some branches would be covering, some wouldn't be. But I'll, you know, I can't speculate what Congress would do. So we'll just move on. I think that that might be exactly what they had in mind. Because despite the fact that Seegers of Newport got the benefit of having access to some resources through Seegers Corporate, it still wasn't enough to get them over the line to have enough business to have 15 employees. All right. Do you have anything else you want to add here today? Do you want me to talk about piercing the corporate veil? Because I'm totally prepared to go through all of these elements and tell you why they don't apply. You need not do that. We have your briefs. Okay. Well, I appreciate your time today. Thank you very much. Thank you. Mr. Hensel, you have that rebuttal time I told you you were fortunate to have. Thank you, Your Honor. One of the earliest points brought up in, by opposing counsel, by the court and opposing counsel, was that this kind of looks like a franchise agreement, a quasi-franchise agreement drawn on the back of a napkin. If that was actually... That's just South Carolina talk. You can go ahead. Understood. It's far fancier in North Carolina. If that's actually what it was, Your Honor, we would have a much weaker case here, I believe. Franchise agreements hold parties responsible for things. A McDonald's franchisee that uses the McDonald's, the logo, the millions of burgers sold or billions of burgers sold, whatever they're at now, they get to use all that McDonald's good advertising stuff. In exchange, they have various obligations to McDonald's corporate. They have to pay rent on the land. They have to give a percentage of their sales. They have to use the exact same ingredients from the exact same suppliers, etc., etc. They're dealing with each other at arm's length. McDonald's gets something out of it. The franchise gets something out of it. Here, that arm's length dealing, the sense of there being two separate businesses, each working in their own interests, is not present. You have branches that, sure, work in their own interests, but they're aggregated under, effectively, a corporate structure. They call themselves corporate and branches. In a corporate office that doesn't exist to make a profit, the corporate office exists exclusively to support the branches. Your Honor, that's not the way a company dealing with another company at arm's length, one that is looking out for its own interests, behaves. Additionally, the branches... Don't they get paid a consulting fee for the work done to consult? Yes, they do. That is another problem because the president... We don't want people that work to get paid? Why is that a problem? Because how it works is that the president and vice president of each of the Seeger's branches is one of those executives from Seeger's corporate. They do not get paid by the branches for being the branches president or vice president. They get paid by Seeger's corporate for their role as president and vice president of a branch. Why would one company pay another company's executive, Your Honor? That's not working at arm's length. That's, in fact, intermingling of funds, which goes towards one of our elements. The fact that these presidents and vice presidents get paid a fee by corporate for consulting for other companies is an example of companies that are not working independently, that are not working in their own interests, that are not dealing with each other at arm's length. So, Your Honor, we believe our strongest theory here is piercing the corporate veil. We do believe that we should also win this on the excessive fragmentation issue, but I will point out that when it comes to piercing the corporate veil, defendants have not actually made an argument against that at this point. At this stage, defendants' entire argument seems to have been focused on the integrated employer test, which is an entirely separate thing from... Do you mean my Hewitt argument? I mean, in brief, I believe they focused pretty much entirely on the integrated employer test. They claimed that the Hewkill case effectively took the teeth out of the Papa V. Katie case as it focused on the integrated employer test, when, in fact, it did that because that was the test that had been put forward by the plaintiff in that case. Hewkill actually, in fact, said that multiple ways of approaching this and cited Papa V. Katie with approval. Can I ask you on piercing the corporate veil? I feel like we haven't talked much about this today. The district court, as I read the district court's opinion, the district court focused, at least in part and largely on the second factor, sort of even assuming full control, alter ego, all of that. It doesn't matter because Seeger's corporate isn't abusing the corporate form itself. It's not affirmatively using this corporate form to sort of commit wrongs. It's not hiding assets. It's not misleading creditors. It's not... The corporate form itself is not being leveraged to do bad acts. Why is that wrong? Oh, that's wrong due to the DeSalt Falcon case, Your Honor, which we cited in our brief. But the DeSalt Falcon case basically said that if... And I see I've run out of time. Can I finish answering the question? You may. The DeSalt Falcon case, which we cited in our brief, says that if the corporate form is misused and therefore used as a liability shield, it is then the corporate... Then the second and third elements for the piercing the corporate veil test, those elements being misuse and approximate cause damage, those elements are presumptively met. And that's because the misuse element would be met by using essentially a fiction to defeat an equitable claim. The approximate cause element would be met by the plaintiff losing their ability to vindicate their rights due to that fiction. So we think the second and third elements are effectively presumed here because using the corporate form, this incorrect corporate form as a defense, it is the exact scenario contemplated in DeSalt Falcon. But it doesn't have certain factors. I'm not sure. Well, it doesn't. All right. Well, thank you, Mr. Hensel. Thank you, Ms. Hotsak. And appreciate both of your arguments. As I've said to the other panels here, other lawyers, you know what we normally do. We come down and we shake your hand and thank you for you coming to visit with us today. I'll do so now because we'll not come down and do it in person, but there will come a time when we'll do it again. So thank you and safe travels home. Court will be adjourned until tomorrow morning. Thank you.
judges: James Andrew Wynn, Pamela A. Harris, Julius N. Richardson